IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BEVERLY WRIGHT, as a wrongful death beneficiary; ISABEL OLIVO SALINAS, as Next Friend of X.J.W., a minor child, as wrongful death beneficiary and Heir to the Estate of JOSHUA WRIGHT, | § § § § § § § | NO. 1:23-CV-00864-DAE |
| *Plaintiffs,* | § § § | |
| vs. | § § | |
| ISAIAH GARCIA, in his individual capacity, and HAYS COUNTY, TEXAS, | § § § § § | |
| *Defendants.* | § § | |
| _____ | § | |

ORDER: (1) DENYING MOTION FOR SUMMARY JUDGMENT;
(2) OVERRULING OBJECTIONS TO EVIDENCE; AND (3) DENYING
MOTION TO STRIKE

Before the Court is: (1) Defendant Isaiah Garcia's ("Officer Garcia" or "Defendant") Motion for Summary Judgment (Dkt. # 31); (2) Defendant's Objections to Plaintiffs' Summary Judgment Response and Evidence (Dkt. # 38); and (3) Defendant's Motion to Strike Plaintiff's Expert Fred Fletcher (Dkt. # 40).

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda in support of and in opposition to the motion and the relevant law, the Court, for the reasons that follow, **DENIES** the

motion for summary judgment, **OVERRULES** the objections to summary judgment response and evidence, and **DENIES** the motion to strike.

BACKGROUND

On December 12, 2022, Joshua Wright ("Wright") was shot and killed by Corrections Officer Isaiah Garcia. (Dkt. # 31-1 at 2–6.) Wright was the son of Plaintiff Beverly Wright and the father of minor child X.J.W. (Dkt. # 1 at PP 1–2.)

Prior to the shooting, Wright was being held at the Hays County Jail in San Marcos, Texas. (See Dkt. # 36-1.) In the early morning of December 12th, while at the jail, Wright reported chest pain and was determined to have elevated blood pressure by medical staff. (Id.) He was then transported to Ascension Seton Hays County Hospital for medical evaluation and treatment. (Id.; Dkt. # 36-2.) After several hours, the officers who accompanied Wright were relieved by officers Snell and Defendant Garcia. (Dkts. ## 36-3 at 50:2-5; 31-1 at 3.) Prior to taking over the watch, Officer Garcia had been informed that Wright was on suicide watch. (Dkt. # 31-1 at 4.) Officer Snell left the hospital early in the shift assignment to complete his hiring process, leaving Officer Garcia alone to guard Wright. (Id. at 3.) After several additional hours of monitoring, hospital staff determined Wright's chest pain was non-acute and he could be discharged back to the jail. (Dkt. # 36-2 at 5.)

Around 11:30 a.m., shortly before the hospital finished discharging

Wright, Wright asked Officer Garcia for permission to use the restroom. (Dkt. # 36-3 at 50:20-24.) To allow him to do so, Officer Garcia unshackled Wright's hand restraints and belly chain, although his legs remained shackled. (Id. at 50:23-51:7, 39:18-20; Dkt. # 36-4 at 00:16-00:34.) Officer Garcia continued to observe Wright while he was in the restroom with the door partially opened. (Dkts. # 31-1 at 4; 36-3 at 51:5-8.) After washing his hands, Wright walked out of the restroom to where Officer Garcia stood waiting with hand restraints. (Dkt. # 36-4 at 00:23-36.)

At this point, Officer Garcia contends that he attempted to give Wright verbal directives to place his hands forward for the hand restraints. (Dkt. # 31-1 at 4.)[1] Instead of complying, however, Wright walked towards Officer Garcia, shoved Officer Garcia with an open hand in the neck area, turned away from the officer, and began to run down the hall. (Dkt. # 36-4 at 00:33-00:40.) Officer Garcia stumbled backwards several feet and started to run after Wright, and instead of drawing his Taser, immediately drew his gun. (Id.; Dkt. # 36-3 at 54:3-4.) Officer Garcia states that, at this time, he began yelling at Wright to "stop."[2] (Dkts. ## 31-1 at 5; 36-3 at 66:18-67:5.) Wright then turned left around a nurses'

---

[1] At this point of the encounter, the audio of Officer Garcia's Body Worn Camera ("BWC") is not activated. Officer Garcia does not turn on the audio until after he has shot and killed Wright.

[2] Officer Garcia did not warn Wright that he would shoot if he did not stop, however. (Dkt. # 36-3 at 66:18-67:5.

3

station with Officer Garcia in tow.  (Dkt. # 36-4 at 00:39-00:41.)  As he did so,

Wright passed closely by a hospital worker but did not approach or contact the

worker in any way.  (Id.)

It appears from the BWC footage that as Wright turned the corner, he

briefly collided with a computer stand before he continued running down the hall.

(Id. at 00:40-00:42.)  According to Officer Garcia, although he did not see Wright

grab anything from this stand or cart as he passed, (Dkt. # 36-3 at 62:14-16), he

believed that Wright "may have armed himself with a medical instrument from the

cart," (Dkt. # 31-1 at 5).[3]

Wright continued to run down the hallway in his leg shackles as his

overly large pants began to fall down.  (Dkt. # 36-4 at 00:41-00:43.)  He passed by

several open rooms with individuals in hospital beds but again did not touch or

interact with any of them.  (Dkt. # 36-4 at 00:40-00:43.)  Officer Garcia appeared

to be gaining on Wright when he fired his first shot at Wright's back.  (Dkt. # 36-4

---

[3] In his affidavit and voluntary statement to the Texas Department of Public Safety ("DPS"), Officer Garcia asserts that when Wright rounded this first corner, he "[came] into contact with multiple medical carts," and that Officer Garcia believed one of those carts was used to hold medical instruments or objects Wright could use as a weapon.  (Dkt. # 31-1 at 5, 9.)  However, the video footage reveals that Wright came into contact with only one cart, a computer cart, before Officer Garcia shot him.  (Dkt. # 36-4 at 00:40-00:45); see Scott v. Harris, 550 U.S. 372, 380–81 (2007) (directing courts, at the summary judgment stage, to view the facts in the light depicted by the videotape).

at 00:42-00:45; Dkt. # 36-3 at 62:1-8.)[4]  At the time of this shot, there is no one

visible in Wright's immediate vicinity, Wright was within Taser range, and Wright

was more than 20-30 yards from an exit.  (Dkts. ## 36-4 at 00:42-00:43; 36-3 at

42:10-17, 117:6-9 (describing location of fourth and fifth shots as about 20-30

yards from the door)).  The first shot hit Wright in his left arm, and he fell to his

stomach.  (Dkts. ## 36-3 at 97:16-18; 36-11 at 3; 36-4 at 00:41-00:46.)  Officer

Garcia then closed the distance so that he was no more than ten feet from Wright

and repeated his commands for Wright to stay on the ground.  (Dkts. ## 36-4 at

00:43-00:46; 31-1 at 5; 36-3 at 68:23-69:6, 109:12-110:12.)  Despite these

commands, Wright rose to his hands and knees, with both hands on the ground,[5]

and Officer Garcia shot him a second time, this time through his right side.  (Dkts.

## 36-4 at 00:43-00:46; 36-3 at 109:12-112:22; 36-11 at 3–4.)  After the second

shot, Wright lifted his right arm and stumbled to his feet.  (Dkts. ## 36-4 at 00:46-

00:47; 36-3 at 113:4-16.)  Officer Garcia then shot Wright a third time.  (Id.)  At

---

[4] In his deposition, Officer Garcia contends that, after Wright came into contact
with the medical cart, Officer Garcia believed Wright "may have struck one of the
nurses because of the way she had moved."  (Dkt. # 36-5 at 1:15-23-1:15:45.)
Notably, the deposition is the first and only time Officer Garcia makes this
statement; his affidavit and statement to Texas DPS make no such claim.  (See
Dkt. # 31-1 at Ex. A, B.)  The video footage does not appear to support such an
account.  (See Dkt. # 36-4 at 00:38-00:43.)
[5] In his deposition, Officer Garcia stated that, at this point, he observed Wright's
hands were open on the ground and acknowledged that Wright's hands were
empty.  (Dkt. # 36-3 at 6:12-18.)

the time of the second and third shots, there were hospital staff and patients nearby: a nurse behind Wright and a patient in front of him.  (Id. at 00:42-00:47.)

Already shot three times and still shackled at his feet, Wright took two steps forward as Officer Garcia closed to approximately five feet of him.  (Dkts. ## 36-4 at 00:46-00:49; 36-3 at 114:8-16.)  Around the corner, a woman lay in a gurney within several feet of Wright, but as Wright moved forward, he appeared to stay on the opposite side of the hallway from the woman.  (Dkt. # 36-4 at 00:46-00:49.)  Officer Garcia then fired his fourth and fifth shots into Wright's back, and Wright fell face forward onto the ground.  (Id.; Dkt. # 36-11 at 3.)  The entire encounter, from Wright shoving Officer Garcia to Officer Garcia shooting his final shot, occurred in a span of approximately 12 seconds.  (Dkt. # 36-4 at 00:36-00:48.)

For the next minute and thirty seconds, Officer Garcia kept his gun trained on Wright and delivered no aid.  (Dkt. # 36-4 at 00:47-02:25.)  Eventually, a hospital security guard approached a visibly unconscious Wright and flipped him onto his stomach.  (Id. at 02:20-02:40.)  Officer Garcia directed hospital staff to get Wright cuffed before they rendered any medical aid to him.  (Id. at 02:40-02:46.)  At no point did Officer Garcia alert anyone to the possibility that Wright may have a weapon, medical instrument, or sharp object on him.  (Id. at 00:49-12:54; Dkt. # 36-3 at 7:5-22.)  Wright was later pronounced deceased.  (See Dkts. ## 36-4 at

6

00:49-12:54; 36-11.)  He had no weapon on him.  (Dkt. # 36-3 at 6:12-7:4, 15:14-21.)

On July 27, 2023, Plaintiffs Beverly Wright, as a wrongful death beneficiary, and Isabel Olivo Salinas, as next friend of X.J.W., a minor child, as a wrongful death beneficiary and heir to the estate of Joshua Wright, ("Plaintiffs") filed suit in this case, alleging an excessive force claim pursuant to 42 U.S.C. § 1983, arguing that Officer Garcia violated Wright's Fourteenth Amendment rights under the United States Constitution.  (Dkt. # 1.)  Plaintiffs later amended their complaint to bring (1) a Fourteenth Amendment excessive force claim against Defendant Garcia pursuant to 42 U.S.C. § 1983; (2) an exemplary damages claim against Defendant Garcia; and (3) a 42 U.S.C. § 1983 Monell Claim – Fourteenth Amendment excessive force claim against Defendant Hays County.  (Dkt. # 25.)

On June 16, 2025, Officer Garcia filed the instant motion for summary judgment.  (Dkt. # 31.)  Plaintiffs timely filed a response in opposition to that motion, (Dkts. ## 34; 36), and Officer Garcia filed a reply along with objections to Plaintiffs' response and summary judgment evidence, (Dkt. # 38).  Plaintiffs then filed a response to the objections.  (Dkt. # 39.)  Officer Garcia also filed a motion to strike Plaintiffs' expert witness Fred Fletcher, (Dkt. # 40), to which Plaintiffs responded, (Dkt. # 42).

LEGAL STANDARD

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

"A qualified immunity defense alters the usual summary judgment burden of proof." Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010). Ordinarily, at summary judgment, the non–movant must bring forward evidence to create a genuine issue of material fact only *after* the movant shows entitlement to judgment as a matter of law. Giles v. Gen. Elec. Co., 245 F.3d 474, 493 (5th Cir. 2001). However, when, as here, a defendant properly pleads qualified immunity, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to immunity. See Escobar v. Montee, 895 F.3d 387, 393 (5th Cir. 2018); Romero v. City of Grapevine, 888 F.3d 170, 176 (5th Cir. 2018).

In deciding whether a fact issue has been created, a court must "view the facts in the light most favorable to the nonmovant." Darden v. City of Fort Worth, 880 F.3d 722, 727 (5th Cir. 2018), cert. denied, 586 U.S. 816 (2018). A

court must also draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).  And, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

Additionally, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.  See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017).

DISCUSSION

Officer Garcia has properly invoked the defense of qualified immunity and now moves for summary judgment on that basis.  (Dkt. # 31.)  "To state a claim under § 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by

9

someone acting under color of state law." Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 252–53 (5th Cir. 2005). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Because qualified immunity is immunity from suit rather than a defense to liability, immunity questions should be resolved at the earliest possible stage in litigation. Id. at 231–32.

"In determining whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry." Romero v. City of Grapevine, 888 F.3d 170, 176 (5th Cir. 2018). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" Tolan v. Cotton, 572 U.S. 650, 655–56 (2014) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The second "asks whether the right in question was 'clearly established' at the time of the violation." Id. at 656 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

10

I.      Violation of a Federal Right

Plaintiffs allege a § 1983 claim for a violation of the Fourteenth Amendment right to be free from excessive force, alleging that Officer Garcia used excessive force when he shot Wright five times as he fled on foot and was unarmed.  (Dkt. # 25.)  The Fourteenth Amendment confers a right upon pretrial detainees to be free from excessive force.  Austin v. City of Pasadena, Texas, 74 F.4th 312, 322 (5th Cir. 2023); Fairchild v. Coryell Cnty., Texas, 40 F.4th 359, 362 (5th Cir. 2022).  "Force against a pretrial detainee is 'excessive' and a violation of the Fourteenth Amendment when the force was objectively unreasonable."  Austin, 74 F.4th at 322 (citing Kingsley v. Hendrickson, 576 U.S. 389, 396 – 97 (2015)).

"[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  Kingsley, 576 U.S. at 397 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  In the pretrial detainee context, considerations that may bear on the reasonableness of the force used include: (1) the relationship between the need for the use of force and the amount of force used; (2) any effort by the official to temper or limit the amount of force; (3) the severity of the security problem at issue; (4) the threat reasonably perceived by the officer; and (5) whether the plaintiff was actively resisting.  Id.  These factors are merely illustrative; they are neither exclusive nor conclusive.  See id.

11

Further, when assessing the reasonableness of the force used, courts must evaluate the officer's actions "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97.

However, when a law enforcement officer uses deadly force, the "objective reasonableness balancing test is constrained. It is objectively unreasonable to use deadly force unless it is necessary to prevent a suspect's escape *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Flores v. City of Palacios, 381 F.3d 391, 399 (5th Cir. 2004) (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)) (internal quotation marks omitted) (emphasis added). Additionally, "[i]t is well-established that the excessive force inquiry is confined to whether the officer or another person was in danger *at the moment of the threat* that resulted in the officer's use of deadly force." Rockwell v. Brown, 664 F.3d 985, 992–93 (5th Cir. 2011) (quoting Bazan ex rel. Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir. 2001)) (emphasis in original). So, the focus of the inquiry

12

should be on "the act that led [the officer] to discharge his weapon[.]" Manis v. Lawson, 585 F.3d 839, 845 (5th Cir. 2009).

Applying the Kingsley factors and drawing all factual inferences in the non-moving parties' favor, Plaintiffs have presented sufficient evidence to raise a genuine dispute of material fact as to whether Officer Garcia acted unreasonably and violated Wright's right to be free from unreasonable deadly force. In this case, the summary judgment evidence reveals that, at the time of the shooting, Wright was on foot, shackled at the feet, and running away from Officer Garcia. Although he did come into contact with some kind of medical cart, it appears from the video that Wright's incredibly brief contact with the computer stand was to push the stand behind him and block Officer Garcia's path. He then passed by several other people without approaching them before Officer Garcia fired his first shot. No one was in Wright's immediate vicinity when the first shot was fired. Wright then fell to the ground, where his hands were visibly open and empty. Despite this, Officer Garcia fired his second, third, fourth, and fifth shots into Wright's side and back, killing him. On these facts, a reasonable jury could find that at the time of the first shot, deadly force was unjustified and objectively unreasonable. See Hatcher v. Bement, 676 F. App'x 238, 243 (5th Cir. 2017) ("In this circuit, Fourth Amendment cases clearly establish—and did so by 2013—that when a suspect is on foot, an officer may shoot the suspect only if a reasonable officer could

reasonably perceive that the suspect posed an immediate and significant threat to the officer or to others."). A reasonable jury could also find that while deadly force might have been justified at the time of the first shot, it was not justified at the time of the second through fifth shots if Officer Garcia could see that Wright's hands were empty. See Lytle v. Bexar County, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). Accordingly, if a jury accepts Plaintiffs' rendition of the facts as true, a reasonable jury could conclude that the deadly force used against Wright was objectively unreasonable. See Tolan, 572 U.S. at 655 (when resolving questions of qualified immunity at the summary judgment stage, courts must view the facts in the light most favorable to the party asserting the injury); Crane v. City of Arlington, Texas, 50 F.4th 453, 461–62 (5th Cir. 2022) ("When there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video. But when video evidence is ambiguous or incomplete, the modified rule from Scott v. Harris has no application. Thus, a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." (internal quotations and citations omitted)).

14

Officer Garcia argues that his use of deadly force was objectively reasonable because he believed that Wright posed a lethal threat to the civilians and hospital workers around him.  (Dkt. # 31 at 10–13.)  In Officer Garcia's account of the events, Officer Garcia was on duty alone when Wright, who Officer Garcia knew was on suicide watch, struck Officer Garcia's neck with enough force that he stumbled back and nearly fell to the floor.  (Dkt. # 31-1 at 4.)  Officer Garcia stated that "Wright's large stature paired with his sudden act of assaulting [him] . . . placed [Officer Garcia] in fear for [his] safety and for the safety of the public[.]"  (Id.)  Wright then ran towards civilians, ignoring commands to stop. (Id. at 5.)  He made contact with multiple medical carts, one of which was used to hold objects that could be used as a weapon, continued down the hall, and possibly assaulted one of the nurses as he went by.  (Id.; Dkt. # 36-5 at 1:15-23-1:15:45.) At that point, Officer Garcia, believing that Wright might have armed himself with a medical instrument and believing that he had already assaulted a nurse, decided to discharge his firearm.  (Dkt. # 31-1 at 5; Dkt. # 31 at 13.)  Officer Garcia further stated that after Wright fell to the ground and got up, he "was still concerned that Wright was armed with a medical instrument."  (Id.)  Because Wright was close to a nurse and a patient lying in a hospital bed, and believing Wright might attempt to

15

harm or threaten one of the people in his immediate vicinity, Officer Garcia fired four more times.  (Id.)[6]

Plaintiffs dispute this account.  In particular, Plaintiffs assert that Wright only came into contact with one medical cart, and that was a computer stand that held only supplies for checking vitals. (Dkt. # 36 at 3.)  Wright collided briefly with the cart and Officer Garcia did not see Wright take anything from the cart.  (Id. at 3, 14.)  Plaintiffs contend that, as is seen in Officer Garcia's BWC footage, Wright did not touch or interact with anyone prior to the first shot.  (Id. at 9.)[7]  And prior to the remaining shots, Plaintiffs assert that Officer Garcia could see that Wright's hands were empty.  (Id. at 4, 13.)  Therefore, Wright did not pose an imminent threat of serious bodily injury to anyone.  (Id. at 12.)

Upon the Court's review of the evidence, Plaintiffs have raised a genuine issue of material fact as to whether a reasonable officer would believe that Wright posed an immediate and significant threat to Officer Garcia or to others in the hospital, thus justifying Officer Garcia's use of deadly force.  Factual disputes

---

[6] Under this rendition of the facts, Officer Garcia is likely entitled to qualified immunity.  However, the Supreme Court has made clear that at the summary judgment stage, even in the context of qualified immunity, courts must construe the facts in the light most favorable to the non-movant, must draw all reasonable inferences in favor of the non-movant, and may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  Tolan, 572 U.S. at 656–57. The Court follows those directives here.

[7] While the footage supports this view, it does not conclusively establish it.  (See Dkt. # 36-4 at 00:40-00:43.)

remain as to whether Wright could have armed himself in the brief moment he collided with the computer cart,[8] as to whether Wright came into contact with anyone before Officer Garcia fired his first shot (i.e. whether he assaulted a nurse), and as to whether Officer Garcia could see that Wright's hands were empty before he fired the second through fifth shots. Each of these disputes is material to the reasonableness of the force used by Officer Garcia and are for the jury to resolve. Therefore, viewing the evidence in the light most favorable to Plaintiffs, the Court finds that there are material factual disputes as to whether Officer Garcia violated Wright's Fourteenth Amendment rights.[9]

---

[8] As noted previously, the video footage does not support the contention that Wright came into contact with multiple carts prior to the first shot, so this Court does not need to credit Officer Garcia's contention to that effect. Scott, 550 U.S. at 380; Crane, 50 F.4th at 461–62.

[9] To the extent that Officer Garcia argues that his conduct is justified or authorized by Texas Penal Code § 9.52, that argument is without merit. (Dkt. # 31 at 9–10, citing Benson v. Galveston Cnty., No. 3:21-CV-200, 2022 WL 17847242, at *5–6 (S.D. Tex. Nov. 29, 2022). Section 9.52 of the Texas Penal Code provides:"[t]he use of force to prevent the escape of an arrested person from custody is justifiable when the force could have been employed to effect the arrest under which the person is in custody, **except that a guard employed by a correctional facility or a peace officer is justified in using any force, including deadly force, that he reasonably believes to be immediately necessary to prevent the escape of a person from the correctional facility**." (emphasis added). However, state law cannot supersede constitutional requirements that force be reasonable. See Garner, 471 U.S. at 4, 21–22 (finding that a statute authorizing "all necessary means: to effect arrest of fleeing felons did not give the officer the authority to shoot a suspect who the officer could not reasonably believed posed any imminent threat of serious bodily injury).

17

In reaching this conclusion that Plaintiffs have overcome the first prong of the qualified immunity inquiry, the Court acknowledges the difficulties of assessing a fleeing detainee's dangerousness, particularly in a tense and fast-paced environment, but follows the Fifth Circuit's guidance that "the reasonableness of an officer's conduct . . . is often a question that requires the input of a jury.  This is not only because the jury must resolve disputed fact issues but also because the use of juries in such cases strengthens our understanding of . . . reasonableness." Lytle, 560 F.3d at 411.  The Court will now address the second prong of the analysis—whether the federal right was clearly established.

II.      Whether the Right was Clearly Established

While the Court has determined that a factual issue exists as to whether Officer Garcia used excessive force against Wright in violation of the Fourteenth Amendment, the Court must still determine if Officer Garcia is entitled to qualified immunity under the second prong of the analysis.  Again, the second prong of the qualified immunity analysis entitles Officer Garcia to qualified immunity if his use of deadly force was "objectively reasonable in light of clearly established law at the time the challenged conduct occurred."  Bush v. Strain, 513 F.3d 492, 501 (5th Cir. 2008).  And, "while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable

18

officer at the scene." Id. at 502.

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" Kinney v. Weaver, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)).  And, there need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005).  The focus of the inquiry is whether the officer had fair notice that his conduct was unlawful. Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018).

The Fifth Circuit has repeatedly stated that it is manifestly unreasonable for an officer to use deadly force on a person fleeing on foot who does not pose a sufficient risk of imminent harm to the officer or others. Allen v. Hays, 65 F.4th 736, 744 (5th Cir. 2023) ("[I]t is *manifestly unreasonable* for an officer to seize a suspect the officer knows is unarmed and not aggressive by shooting him dead." (emphasis added)); Hatcher, 676 F. App'x at 243 ("In this

19

circuit, Fourth Amendment cases *clearly establish*—and did so by 2013—that when a suspect is on foot, an officer may shoot the suspect only if a reasonable officer could reasonably perceive that the suspect posed an immediate and significant threat to the officer or to others." (emphasis added)); Lytle, 560 F.3d at 417 ("It has long been *clearly established* that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." (emphasis added)); Poole v. City of Shreveport, 13 F.4th 420, 425 (5th Cir. 2021) ("It should *go without saying* that it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" (emphasis added)).[10]

The application of this clearly established law in analogous or near-analogous cases provided fair warning to Officer Garcia that it would violate the Fourteenth Amendment to shoot a pretrial detainee who, at the time of the first shot, is shackled at the feet, reasonably believed to be unarmed, running away from the officer, and where no one is in his immediate vicinity, and who, at the time of the second through fifth shots, is visibly unarmed, wounded, and still shackled at

---

[10] Because the standard for analyzing Fourth Amendment and Fourteenth Amendment excessive force claims is the same, the Fifth Circuit has frequently relied on Fourth Amendment excessive force cases to find that officers had notice that their uses of force against pretrial detainees were excessive. Boyd v. McNamara, 74 F.4th 662, 667 n.3 (5th Cir. 2023). This Court does the same.

the feet.[11]  Garner, 471 U.S. at 3–4, 20–21 (finding that, where the officer could

not reasonably have believed that the fleeing, likely unarmed suspect posed a threat

of physical danger to the officer or others, deadly force was unjustified); Poole, 13

F.4th at 425 (use of deadly force against a non-compliant but visibly unarmed

suspect is manifestly unreasonable even if the suspect was fleeing the scene);

Hatcher, 676 Fed. App'x at 239–40, 243 (concluding that it violates the Fourth

Amendment to shoot a suspect who had struggled with an officer, fled on foot, and

"appeared to act very aggressive," but who did not pose an immediate and

significant threat to the officers or others at the time of the shooting); Ham v.

Brice, 203 F. App'x 631, 635 (5th Cir. 2006) (district court's denial of summary

judgment proper where officer shot unarmed suspect who had broken free from the

officer and fled on foot allegedly towards the officer's vehicle, which held several

loaded firearms); Lytle, 560 F.3d at 413 (noting that an exercise of force may be

reasonable in one moment, but unreasonable the next).

---

[11] Of course, there is a factual dispute about whether a reasonable officer in Officer Garcia's position would believe that Wright might have armed himself with a medical instrument based on his brief contact with the computer stand.  At this stage, however, the Court must draw all reasonable inferences in favor of Plaintiffs, even in the second prong of the qualified immunity analysis.  Tolan, 572 U.S. at 657.  And, as the Fifth Circuit clarified in Roque v. Harvel, at the second prong, we look to the Plaintiffs' set of facts, so long as those facts are not blatantly contradicted by the record evidence.  993 F.3d 325, 336–27 (5th Cir. 2021) (analyzing whether the federal right was "clearly established" "[i]f the jury accepts Plaintiffs' narrative[.]"); Lytle, 560 F.3d at 417–18 (applying the plaintiff's view of the facts to find that the officer's conduct violated a clearly established right).

Further, clearly established law put Officer Garcia on notice that the mere fact that Wright was on suicide watch, or the fact that Wright initially shoved Officer Garcia before running off, did not give him license to use deadly force without more. See Roque, 993 F.3d at 335–36 (although the officer believed the individual was armed and a threat to a bystander at the time of the second shot, the plaintiffs' narrative was that the officer fired the second shot at a suicidal, but unarmed and wounded man, and based on that narrative, the officer's actions were "obvious[ly]" unconstitutional); Amador v. Vasquez, 961 F.3d 721, 725, 730 (5th Cir. 2020) (finding shots fired at a suicidal, knife-wielding man who had tried to stab officers a few minutes earlier were excessive when man was standing still holding the knife when officers fired at him); Lytle, 560 F.3d at 412, 414 (recognizing that while an officer who shot at a vehicle that was moving towards him would likely be entitled to qualified immunity, an officer who shot at a car three to ten seconds after the car stopped moving towards him would not be); Fairchild, 40 F.4th at 367–68 (concluding that deadly force applied to pre-trial detainee who had kicked and bit officers several seconds earlier but who was currently subdued violates clearly established law); Hatcher, 676 Fed. App'x at 239–40, 243.

The Court acknowledges that there are distinctions between the above-cited cases and the case at hand. However, to overcome qualified immunity,

22

Plaintiffs are not required to locate a case "directly on point." Al-Kidd, 563 U.S. at 741. Rather, "[t]he central concept is that of 'fair warning.'" Kinney, 367 F.3d at 350. Upon careful consideration, the Court finds that Officer Garcia had such fair warning here and that the right to be free from excessive force was clearly established in this case. If a jury accepts Plaintiffs' version of the facts as true, particularly as to what occurred in the moments before Officer Garcia shot Wright the first time, and the moments before Officer Garcia shot Wright the second through fifth times, the jury could conclude that Officer Garcia violated Wright's clearly established right to be free from excessive force. See Cole v. Carson, 935 F.3d 444, 447, as revised (5th Cir. Aug. 21, 2019) (en banc) ("We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the . . . excessive-force claim."). Accordingly, the Court finds there are material factual disputes that must be resolved to make the qualified immunity determination, thus precluding summary judgment in this case.

III.   Objections to Evidence

Officer Garcia has filed several objections to Plaintiffs' summary judgment response and evidence. (Dkt. # 38.) While Officer Garcia's objections are far from clear, it appears that he objects to (1) Plaintiffs' "Facts" section in their response to the summary judgment motion; (2) Exhibits E(2) and E(3), clips

from the deposition of Officer Garcia; (3) Exhibit C, excerpts of the transcript of Officer Garcia's deposition; (4) Exhibit E, the full video of Officer Garcia's deposition; and (5) Exhibits F, I, J, K, and L, screenshots of Officer Garcia's BWC footage.  (Id. at 2–3, 11.)  The Court addresses each objection in turn.

A.    Plaintiffs' "Facts" Section

Officer Garcia first objects generally to the entirety of Plaintiffs' "Facts" Section in their response.  (Dkt. # 38 at 1.)  Officer Garcia argues that this section includes (1) impermissible legal arguments and conclusions; (2) misstatements concerning testimony; (3) inappropriate opinions; (4) irrelevant facts and/or beyond the scope of the pleadings; and (5) facts unknown to Officer Garcia at the time of the incident.  (Id.)  In making this objection, Officer Garcia does not point to any specific evidence, statement, or facts to which he objects.  (See id. at 1–2.)  He merely references seven pages and asks the Court to find where within those seven pages the allegedly impermissible statements appear.  The Court need not and does not credit such an objection.  See United States v. Avants, 367 F.3d 433, 445 (5th Cir. 2004) ("Evidentiary objections must be specific."); Paske v. Fitzgerald, No. CIV.A. H-12-2915, 2014 WL 1366552, at *5 (S.D. Tex. Apr. 7, 2014), aff'd, 785 F.3d 977 (5th Cir. 2015) ("Because Defendants do not specify which of their objections apply to which of the

24

numerous statements they identify, their objections are OVERRULED."); Fed. R. Ev. 103(a)(1).

In any event, the Court sees no merit to Officer Garcia's boilerplate objection. Plaintiffs here presented a detailed description of the facts as they view them, which they are permitted to do, with corresponding citations to the record. Officer Garcia has not identified any facts that are conclusively contradicted by the record evidence, any "misstatements," any "misleading" assertions, or any supposed "legal arguments."[12] To the extent that Plaintiffs' Facts section contains any such statement, the Court does not rely on Plaintiffs' response when deciding a summary judgment motion; rather, the Court looks at the summary judgment record itself, as it has done here. And while it is true that in analyzing a defense of qualified immunity, the Court can consider only the facts knowable to Officer Garcia at the time of the shooting, the Court has followed that directive. See Cole

---

[12] Officer Garcia does challenge what he describes as Plaintiffs' "interpretation" of (1) Officer Garcia's phone calls with his supervisor after the shooting, and (2) Officer Garcia's observation that Wright came into contact with at least two medical carts. (Dkt. # 38 at 2.) However, in making the objection to these "statements," Officer Garcia does not provide a citation nor state with any specificity what exactly he takes issue with in Plaintiffs' background section. Further, with respect to the phone calls Officer Garcia had with his supervisor, the Court did not take those into account in its analysis. And with respect to the statements surrounding Wright's contact with any medical carts, the Court relied on the video footage, not Plaintiffs' statements, when considering the summary judgment motion. Officer Garcia's objections to these points are therefore meritless.

25

v. Carson, 935 F.3d 444, 456 (5th Cir. 2019) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." (citation omitted)).  Defendant's objection is **OVERRULED**.

B.      Exhibits E(2) and E(3)

Next, Officer Garcia objects to Exhibits E(2) and E(3) because the clips are "cherry-picked" and fail to give the Court proper context.  (Dkt. # 38 at 2.)  The Court struggles to understand this objection as the entirety of Officer Garcia's deposition is on file with the Court.  See Williams v. City of Houston, Tex., No. CV H-16-3342, 2019 WL 2435854, at *7 (S.D. Tex. June 11, 2019) (overruling objection to excerpt of a document because the complete document was also submitted).  Regardless, in considering the summary judgment motion, the Court did not rely on these exhibits so the objection will be **OVERRULED AS MOOT**.

C.      Exhibit C

Officer Garcia objects to Exhibit C, which contains excerpted portions of Officer Garcia's deposition transcript.  (Dkt. # 38 at 2.)  His objection appears to be that the transcript includes portions of the deposition where Plaintiffs conducted a frame-by-frame analysis of the BWC footage with Officer Garcia.  (See id.)

Officer Garcia argues that this type of "factual" analysis from screenshots of the body camera footage has been prohibited by the Supreme Court.  (Id. at 2–3.)

Again, in making this objection, Officer Garcia does not identify what specific portions of the transcript he takes issue with.  Exhibit C is 49 pages long, and the Court will not search the entirety of the transcript to somehow discern what Officer Garcia finds impermissible.  See Avants, 367 F.3d at 445.  Officer Garcia also fails to cite any law for the assertion that Plaintiffs are prohibited from reviewing the BWC footage with the officer during a deposition.  As the Court understands it, that is not the Monday morning quarterbacking to which the Fifth Circuit referred in Harmon v. City of Arlington, Texas.  16 F.4th 1159, 1165 (5th Cir. 2021).  Rather, what the Fifth Circuit cautioned against in that case was courts reviewing an incident with the benefit of 20/20 hindsight and second-guessing the decisions of officers from the peace of their chambers.  See id.  Officer Garcia offers no reason for why Exhibit C violates this principle, and the Court does not see one.  See also Curran v. Aleshire, 800 F.3d 656, 664–65 (5th Cir. 2015) (examining the still pictures taken from the video).  Accordingly, the Court **OVERRULES** the objection.

   D.   Exhibit E

Officer Garcia's objection to Exhibit E, the video deposition of Officer Garcia, mimics his objection to Exhibit C.  Again, Officer Garcia fails to

27

point to any specific segment within the three hour and twenty-minute video.  This objection is **OVERRULED** for the same reasons as Officer Garcia's objection to Exhibit C.

E.      Exhibits F, I, J, K, and L

Finally, Officer Garcia objects to Exhibits F, I, J, K, and L, screenshots of Officer Garcia's BWC footage.  (Dkt. # 38 at 2.)  In considering the summary judgment motion, the Court did not rely on these exhibits so the objection will be **OVERRULED AS MOOT**.

IV.    Defendant Garcia's Motion to Strike

On September 17, 2025, Officer Garcia filed a motion to strike the testimony of Plaintiffs' expert Fred Fletcher ("Chief Fletcher").  (Dkt. # 40.)  Plaintiffs responded in opposition to the motion.  (Dkt. # 42.)  In the motion to strike, Officer Garcia objects to Chief Fletcher's testimony because (1) Chief Fletcher is not qualified to testify in the case; (2) Chief Fletcher testifies to legal conclusions; and (3) Chief Fletcher's testimony is confusing and prejudicial.  (Dkt. # 40.)

With respect to Chief Fletcher's qualifications, Officer Garcia's complaint is that, because Chief Fletcher is not a licensed jailer, has never been through training as a correctional officer in the State of Texas, and has never supervised correctional officers, he cannot testify on this matter.  (Id. at 4.)  The

28

Court disagrees.  Chief Fletcher has worked for decades in law enforcement and has experience guarding pretrial detainees at hospitals and supervising officers who were responsible for guarding pretrial detainees at hospitals.  (Dkt. # 42-16 at ¶ 10.)  He is therefore qualified to testify to the law enforcement practices applicable to this case.  See Boyd, 74 F.4th at 667 n.3 (noting that the standard for excessive force cases under the Fourth Amendment and excessive force cases under the Fourteenth Amendment is the same); Williams v. Manitowoc Cranes, L.L.C., 898 F.3d 607, 623–25 (5th Cir. 2018) (rejecting an argument that an expert is unqualified based on an imprecise match between their qualifications and the issues they planned to testify about where the expert used reliable methods and their testimony is relevant to the case and dismissing such a "battle of labels" as absurd); United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004) ("To qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." (citation and internal quotations omitted) (cleaned up)); Fed. R. Ev. 702 (an expert can be qualified by knowledge, skill, experience, training, or education).  Officer Garcia's claim to the contrary rings especially hollow where his own proffered expert is similarly not a prior corrections officer. (See Dkt. # 31-1 at 21–22.)

29

With respect to Officer Garcia's contentions that Chief Fletcher's testimony should be excluded because it includes legal conclusions and it is confusing and prejudicial, the Court will defer ruling on what precise testimony is or is not admissible until trial. The Court did not rely on Chief Fletcher's testimony in ruling on the summary judgment motion, and a wholesale exclusion of Chief Fletcher's testimony at this stage of the case is premature. The Court therefore **DENIES** Officer Garcia's motion to strike. Officer Garcia may re-raise his specific objections at trial should the need arise.

CONCLUSION

Based on the foregoing, the Court will **DENY** Officer Garcia's Motion for Summary Judgment (Dkt. # 31), **OVERRULES** Officer Garcia's objections to Plaintiffs' summary judgment evidence (Dkt. # 38), and **DENIES** the motion to strike (Dkt. # 40). Trial in this case will be set by separate order.

**IT IS SO ORDERED**.

**DATED**: Austin, Texas, March 9, 2026.

_____
David Alan Ezra
Senior United States District Judge

.